Good morning, Your Honors. May it please the Court, my name is Chung Han, and I'm an Assistant U.S. Attorney, and I am representing the Federal Bureau of Prisons Correctional Officers Keith Fields and Brian Mason in their individual capacities, and I would like to reserve three minutes for rebuttal. Plaintiff Appellee Warren Armstead has brought Bivens' actions against these officers, claiming that they violated his Eighth Amendment right to be free from cruel and unusual punishment when he was assaulted by his cellmate. In order to meet this standard for deliberate indifference, Mr. Armstead must demonstrate that the officers were deliberately indifferent to his safety. Deliberate indifference has both an objective and a subjective component in that the prison official must be aware of facts that the inference could be drawn that there is a substantial risk of serious harm, and the prison official in fact drew that inference, but disregarded the risk by failing to take reasonable measures to protect the inmate's safety. Neither the objective nor the subjective component can be met in this case. In addition, the District Court erred in denying the officers' summary judgments that they were not entitled to qualified immunity. Qualified immunity balances two important interests. One, the need to keep public officials accountable when they abuse their power, and two, to shield these same officers from personal lawsuits when they perform their duties reasonably. Here the officers performed their duties reasonably. There are two events the District Court and this Court must consider in determining whether Mr. Armstead's constitutional rights were violated on November 9, 2009. First is the cell placement, and the second is when he met his cellmate, Jose Barajona. As for the cell placement, when Mr. Armstead and the seven other members of the HVAC team were brought to the Special Housing Unit, which is known as the SHU, the officers knew that they were members of the same crew. They knew that they were brought to the SHU for a temporary stay in order to allow the prison officials to look for a missing screwdriver. They knew they had been held in the holding cell of the SHU for an hour to an hour and a half, peacefully, without any incident. Officer Fields was the officer in charge that evening, and he was the one who questioned the inmates for selling purposes. He knew that neither Mr. Barajona or Mr. Armstead was listed as a separtee of one another. A separtee is someone who cannot be placed in the same cell with another person, and so they would be temporary. Because of that, he allowed the team to choose cellmates. There were eight members. Six of the members teamed up, which left Mr. Barajona and Mr. Armstead. Mr. Armstead claims that it was at this time that Mr. Barajona stated that he wanted to be celled with a member. I mean, there is a verified complaint or a declaration saying that, so those are our facts for present purposes, right? Yes. So claim is just not a good word. I apologize, Your Honor. So those are the facts, and those facts were accepted for purposes of the summary judgment motion. So what Mr. Barajona said was that he did not want to be celled with someone who was not a member of his gang. He was a member of the South Siders, which is a Southern California Latino gang, and he said that he did not want to be housed with blacks. Mr. Armstead is African American. However, he did not threaten Mr. Armstead. He did not do anything that would cause Officer Fields to believe that he would be a threat to Mr. Armstead. That was the only statement that he made, which was for a cell preference. There was no other action that he took. Officer Mason, the other officer who was being sued in his personal capacity here, was the runner that evening. So what he did was he escorted Mr. Barajona and Mr. Armstead to his cell, to their cell. During that — We actually read all the facts. It would be more useful if you made a declaration. Yes, Your Honor. So my point is, based on these facts, there could not have been an Eighth Amendment violation as to the cell placement. Now, there's also the second event, which is after they had been in the cell for an hour and a half to two hours, Mr. Armstead pressed the duress call. Now, as to the — as the pressing of the duress button, the other cases where they — where qualified immunity has been denied to prison officials is when they didn't respond. Here, they responded immediately. And Mr. Armstead admits that they responded immediately. He said that four officers came running as fast as they could. And Officer Fields got there first, Officer Mason got there second, and the two other officers in the cell, what they saw was that Mr. Barajona and Mr. Armstead were standing. They could see them in the window through the cell. They could see that they were not engaged. And they knew at this point that they had been together in that cell for nearly two hours. When they got there, Mr. Barajona said, my cellie has to move. Mr. Armstead said, you know, I don't want to be here. And they start — Officer Fields started asking questions. He said — and he said, come on, guys, you only have to be here for the night. And that's when Mr. Barajona struck Mr. Armstead. At that time, there was — they were still assessing the situation. This is very different, Your Honors, than other — deliberate and different cases where there was no response. And that's demonstrated by the cases that Mr. Armstead cited in his brief. He cites a Seventh Circuit case where the inmate pressed the arrest button, but the officer didn't respond. He didn't investigate, as he was supposed to do. And then in the Rule 28J letter, they cite to a recent case from the circuit, the Castro case. And in that case, it was the same thing, where there was a failure to respond. The inmate in Castro was pounding on the wall for a full minute, and there was no response. Here, there was a response. And that's what distinguishes this case from other cases, and why they should — Can I ask a legal question? Yes, Your Honor. I mean, we haven't gotten out of the facts in the whole argument. But a legal question is this. If — I'm wondering what role the second prong of qualified immunity plays when you have a deliberate indifference standard at the front end. In other words, in order to have an Eighth Amendment violation, as you said, you have to prove that — both that, objectively, they should have realized there was a problem, and that they, in fact, did draw the inferences and consciously disregarded. Is that essentially the standard? Yes, Your Honor, for the first part of the qualified immunity analysis. Okay, but how can there then be a second part? Because if they drew the inference and consciously disregarded it, doesn't that eliminate any possibility at the second prong that they could have believed that they were right to do that? If they drew the inference and just consciously disregarded it? Well, yes, Your Honor, but the facts are — I understand that. I was asking a legal question. This is a problem I'm having throughout the argument, okay? I'm asking you whether there really isn't any second prong under these there was, in fact, an Eighth Amendment violation, which includes the mental element of knowing that there was a danger that was disregarded. Then how can there be ever a second qualified immunity prong? I would agree with Your Honor on that point. So there is no second prong. We're just at the first prong. Well, on the clearly established part, yes, Your Honor, because — Right, that's right. Because here, there have been no legal cases that showed that when an officer, in fact, responded to a dress call and was in the process of assessing the situation, that the law had not been clearly established in that instance. At the objective standard, you would say, but — right. And as you say, objectively speaking, it wasn't clearly established that disregarding this was an unreasonable thing to do. No, Your Honor. The clearly established prong is the legal analysis. The Eighth Amendment analysis is whether there was a substantial risk of serious harm. Right. Okay. Right. So the clearly — So what's clearly — what clearly establishes whether there was, under these circumstances, a substantial risk of harm? Right. And if there are case laws that show that under similar circumstances, that the officer's actions were unreasonable. I'd like to reserve the remainder of my time, Your Honor. Thank you. Good morning, Your Honors. Lisa Jaskol from Public Counsel, representing Mr. Armstead. My friend's recitation of the facts left out one factor, which was the statements by the officers in which the officers declared that if they had known these facts about what Mr. Barahona told the officers — they say that they, in fact, didn't know these things, but for purposes of summary judgment, they said if we knew that Mr. Barahona had told us that, one, he could not be except another South Sider, and if we knew that Mr. Barahona had said that he could not be selled with an African-American, and if we knew that he had used a racial slur concerning African-Americans, then no, if we knew these things — Well, I mean, why does all that lead to — whatever they said, they might have said we wouldn't have done it, but they didn't say because we would have thought that there was going to be a physical attack. Right, well — And why does it suggest that there would have been a physical attack? Well, the issue is that Mr. Armstead was the only African-American prisoner present, the only person who — I understand that, but that's not what I'm asking you. Yes, I see. I think in the context of the situation when the prisoner — well, what the officers actually say in their statements is, if we knew that a prisoner objected to being placed with another prisoner in a cell, we would not place them together because that wouldn't be safe, is essentially what they're saying. So having made this admission that, oh, no, we would never place prisoners together if they objected because we're trained officers and we know, you know, that to keep people safe, I'm — okay, if you want the exact language, because I don't want to be accused of reading things into it, the exact language of their statements is from Officer Fields, is, if an inmate had voiced a concern about being celled with another inmate, I would not have placed them in the same cell. It is my practice to place inmates in cells where they will remain safe. That's Officer Fields. From Officer Mason, I do not believe Officer Barahona made such comments because if he had, I would not have ignored comments that indicated that an inmate did not want to be celled with another inmate. It is my practice to use my experience as a senior officer and sound correctional judgment to place inmates in cells where I believe they will remain safe. Now, on summary judgment, the court views the evidence in the light most favorable to the nonmoving party. And again, for purposes of summary judgment, we consider that a jury — and this is under Farmer — the court in Farmer explained that inferences can be drawn from, let's see, whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. So when you take all of this together, I think that that supports our position that a reasonable fact finder taking into account Mr. Barahona's statements, which we get to use for summary judgment purposes, plus the Farmer rule using inferences from circumstantial evidence, I think that we have to conclude that you don't need an actual threat of violence from Mr. Barahona. We now have an inference that the officers should have realized that there was a substantial risk of serious harm. And — Counsel, Judge Gould, if I could interject a question that might be relevant on the inference argument that you're making. Is there anything in the record that tells us whether the guards involved had knowledge of animosity between the Southsiders gang, which Mr. Barahona was in, and African Americans? I don't recall seeing anything about that. Well, there's the racial slur. But anything more than Mr. Barahona's own statements about not wanting to be selled with an African American — there are the statements from Mr. Meador and the other two — the other two — there are the declarations from the other two prisoners that are offered in support of Mr. Armstead's opposition to the summary judgment motion. And they do make mention of, you know, everybody knows that you don't place, you know, African Americans in the same cell as the Sereños because of this animosity. Let me see if I can get you — Well, we can find — we can find what's in the record. Yeah. So those would be, I think, the closest that you would come to something like that. Okay. Thank you. So — and later on, the risk to Mr. Barahona — the risk to Mr. Armstead, excuse me, became very obvious when he sounded the duress alarm. And the officers came, and he said, I'm in harm's way. Mr. Barahona has put his hands on me, and he's gotten pressure to hurt me. And at that point, Mr. Barahona once again said, I cannot be housed with a black person. And the officers in their brief even admit, at this point, we could have been aware that Mr. Barahona poses an actual threat to Mr. Armstead. So an officer — the officers at that point simply made some dismissive comments. I don't think he's going to do anything. Oh, you only have to stay the night. And they walked away. And that's when Mr. Armstead was attacked by Mr. Barahona. Now, the district court opinion kind of — and obviously, it's a de novo review anyway, but doesn't really at that point say why you're then going to draw the inference on the second prong of farmer that they knew this and deliberately — they drew the inference that even though he said they're not going to harm you, they actually thought he was going to harm him or recognize the risk and deliberately ignored it. Where would we get that from on this record? Well, I think the district court did say it was obvious. I'm not sure she — well, but whatever she said, I mean, it's up to us. But I do think there was a vacuum in the opinion. But anyway, tell us why we should draw that inference. OK, maybe I'm wrong on that. So I'm looking at page 13 of the excerpts of record. These statements show that the defendants knew that an inmate's expressed concern about being housed with another inmate creates a serious safety risk. Let's see. But — oh, here it is. OK, I'm sorry. Yeah, it is on excerpts of record, page 13. Both admitted that such a statement from an inmate creates an obvious risk of harm. I think that's what I was thinking of. That's the object of standards. I understand it. But the question is — I see. Yeah, OK. I'm asking a different question. But in any event, why should we draw that inference? When he said — I mean, you're essentially saying when he said, I don't think he's going to do anything, he actually didn't believe that. And he actually thought that there was a risk and he decided to leave it alone anyway. Right. Well, I think that — That's right. I mean, that's essentially what you're asking us to draw. Yes, I understand. I think that the fact that — Or to say somebody could draw, that a jury could draw. OK. Right. I think the fact that Mr. Mason said that doesn't mean that that's necessarily what he thought. I know that. But I want to know — I'm sorry. OK. So why should we think that even though he said that, he really did have this state of mind? Well, I don't think you have to decide that. You need to decide that a reasonable jury — I know that. So why would we — on what basis would we draw that inference? Or I'll say that somebody could draw an inference. That's exactly what I said before. Because by that point, the danger really was obvious. That's one reason. Because by that point, you had such a huge amount of information that there was this risk. That you had a gang member who had made repeated statements that he did not want to be You had the officer saying, hey, we knew if somebody's making these statements, we got to get these people in separate cells because there's a risk to safety. And I mean, I think actually by itself, the officer's statements that as a matter of safety, they can't put people together if they've objected to being together. I think that by itself answers your question. But besides that, then you have them being in the cell together. You have the duress alarm going off. You have Mr. Armstead saying to the officers, this guy's put his hands on me. I'm at risk of harm. Get me out of here. And then — Counsel, Judge Gould, I think we're sort of rehashing a little here. But I want to know on a legal point, can a jury infer deliberate indifference from reckless disregard to a known risk? Yes, that is, I believe, exactly what the jury can do under the Farmer case. Under the Farmer case, that would be an inference from circumstantial evidence that the jury could draw. Whether a prison official has the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. That's the Farmer decision. I don't see a problem. OK. We're out of time. Thank you. Thank you very much. Thank you, Your Honors. I'd like to point out one error that the district court made, and counsel again stated that same error, is that the officers walked away after the duress button was called, and they did not. I mean, that's on page ER 83 and 84, that they stayed. They were standing there. They were looking at them. They were assessing the situation. And that is what makes this case different from other cases of deliberate indifference, where there was no officer engagement, and the harm occurred because there was no officer engagement. Here, there was officer engagement. And that's very important. And as Your Honor stated— Well, one thing I couldn't tell from the record is, I mean, I gather they were standing there, but the guy, nonetheless, Barahona hit Armstead. Are there allegations of injury from this? Yes, Your Honor. Mr. Armstead was treated with over-the-counter medication, and he did suffer a bite to his thumb, and he was punched in the back— I'm sorry? A bite to his thumb. I see. And he was punched in the back of the head and the neck. So there was— So what difference does it make that they were standing there? Excuse me? I mean, they weren't— They were still assessing the situation. I mean, they were still assessing to see if there was a substantial risk, because at that time, there were no facts that would have demonstrated to them that that Eighth Amendment standard of a substantial risk of serious harm existed. He didn't take him out of there right away. They left him there. He was talking to them. They did not walk away. And that was the important point that the district court got wrong. They were assessing, and under those circumstances, that there has been no case that I have found, and Mr. Armstead has not cited any, that there has been a case of deliberate indifference in those circumstances when the officers indisputably responded and they were assessing. What is the Seventh Circuit case that you were relying on, by the way? Excuse me? Which Seventh Circuit case were you talking about earlier? Oh, the Veloz case. Which one? Veloz. It's V-E-L-O-Z. I see. It's cited in Mr. Armstead's brief, where the— Your brief. Excuse me? Not in your brief? Well, that's the case that I was talking about earlier, where the officers didn't respond to the duress call personally. Here they did. And I do want to bring the court to this court's recent decision in Labatade, where this court found that an officer doesn't have to give in to an inmate's gang preferences. They don't have to do that. They have the ability to assess the situation. But what is the relevance of the fact that the officers here both said that, had they known, had—essentially, had the facts been as Mr. Armstead said they were, they would have realized—they would have taken him out because it wouldn't have been safe? What's the relevance of that? Those declarations were inartfully stated, Your Honor. But what they were stating was— All right, but they're there. And the question is, what do we do with them now? If there was a threat to their safety, and that's the Eighth Amendment standard, a substantial risk to his safety. There was no threat here. I thought what they said was, if we knew they didn't want to be put in the same cell together, we wouldn't have done it because it wouldn't have been safe. Because it wouldn't have been safe. Right, because it wouldn't have been safe. Because they didn't want to be together, not because—they didn't say anything about threats. Well, that's where the inartful statement comes in, Your Honor. They shouldn't have stated that. And the Eighth Amendment standard would still apply. I mean, even if they stated that, it would still apply. And here there was no threat. And when Your Honor asked plaintiff's counsel what that threat was, they couldn't cite any. The only thing they have is one comment to Officer Fields that stated a gang-based preference, and one comment to Officer Mason that stated the same preference. That's all there is. There is no threat. And here—and to answer Judge Gould's question, there were affidavits that said there's—that their politics didn't allow it. But Labattad also addressed that. Because in Labattad, there were affidavits by other gang members who said, yeah, our gangs can't be together. But the court said that's not enough. There has to be a specific threat to the individuals who are actually involved. All right. Thank you very much for your time and your arguments. Armistead v. Fields is submitted, and we will take a short break. Thank you.
judges: Gould, Berzon, Steeh